UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No. 1:22-CR-59 |
| | ) | |
| WILLIE J. HATCH | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO DISMISS COUNT 7**

Comes now the United States of America, by its counsel, Clifford D. Johnson, United States Attorney for the Northern District of Indiana, through Stacey R. Speith, Assistant United States Attorney, and files the Government's Response in opposition to Defendant's Motion to Dismiss Count 7 based upon *New York State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111 (2022).

**I.   FACTUAL BACKGROUND**

On November 19, 2018, Willie J. Hatch was convicted of Domestic Battery, a class A misdemeanor, in Allen Superior Court, Fort Wayne, Indiana, case number 02D06-1811-CM-5468.  On that same date, the sentencing judge issued a "Domestic Violence Determination," finding that:

> in accordance with I.C. 35-38-1-7.7, having heard evidence at trial, or based on a factual basis provided as part of a guilty plea in this case, now finds that the Defendant has committed a crime of domestic violence, as defined by I.C. 35-31.5-2-78.  The Defendant has been advised that upon conviction: he/she shall lose the right to possess a firearm, possession of a firearm or ammunition may constitute a separate crime, parenting time with minor children may be restricted, and other legal penalties may be applicable and should be discussed with his/her attorney.

(Govt. Exhibit A). "Crime of domestic violence" is defined by I.C. 35-31.5-2-78, and includes an offense that has an element which involved the use of physical force or the threatened use of a deadly weapon and is committed against a current or former spouse, parent, or guardian of the Defendant, a person with whom the Defendant shared a child in common, a person who was cohabitating with or had cohabitated with the Defendant as a spouse, parent or guardian, or a person who was or had been similarly situated to a spouse, parent, or guardian of the Defendant.

On October 20, 2022, authorities executed a federal search warrant at Hatch's residence—following four controlled buys of methamphetamine from Hatch—and found methamphetamine and a firearm. The Grand Jury returned a seven count Indictment charging Hatch with: Counts 1, 2, 3, and 4, distributing 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1); Count 5, possessing with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1); Count 6, possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and Count 7, possession of a firearm after previously having been convicted of a misdemeanor crime of domestic violence, in violation of 18 U.S.C. § 922(g)(9).

Under 18 U.S.C. § 922(g)(9), it is unlawful for someone to possess a firearm if they have "been convicted in any court of a misdemeanor crime of domestic violence." A qualifying "misdemeanor crime of domestic violence" is one that "has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon" against a statutorily listed victim. 18 U.S.C. 921(a)(33)(A).

2

Hatch now asks this Court to dismiss Count 7 as violating the Second Amendment.

## II. LEGAL ANALYSIS

### A. *Bruen's* "Text and History" Test.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment guarantees the right of "law-abiding, responsible citizens" to keep and bear arms for self-defense. 554 U.S. 570, 635 (2008). The Court cautioned that the right "is not unlimited" and does not allow everyone to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 626.

In *Bruen*, the Court explained the Amendment protects the right of law-abiding citizens with ordinary self-defense needs to exercising their right to keep and bear arms. 142 S. Ct. at 2156. *Bruen* struck down a law requiring residents to demonstrate "proper cause" to obtain a license to carry a handgun outside the home. *Id.* The Supreme Court clarified that the Second Amendment protections only apply to law-abiding citizens. "The Second Amendment 'is the very *product* of an interest in balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self defense." *Id.* at 2131. "The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Id.* at 2156, citing

3

*Heller,* 554 U.S. at 581. The majority makes more than ten references to "law-abiding" citizens, and the phrase is repeated no fewer than eighteen times in the majority and concurring opinions.

Under the Court's two-step analysis, *Bruen* first directed that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30. If the conduct is covered, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. There are two avenues of historical inquiry: (1) a "straightforward historical inquiry," which applies when "a challenged regulation addresses a general societal problem that has persisted since the 18th century." 142 S. Ct. at 2131. Here, courts should pinpoint evidence of "a distinctly similar historical regulation addressing that problem." *Id;* or (2) inquiry by "analogy" since "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* The "*central* considerations" are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2132-33 (emphasis in original) (cleaned up); *see also id.* at 2133 ("how and why the regulations burden a law-abiding citizen's right to armed self-defense"). This "analogical reasoning … is neither a regulatory straightjacket nor a regulatory blank check" and "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin.*" *Id.* at 2133 (emphases in original) (cleaned up).

4

**B.     This Court should deny based on binding Circuit precedent**

After *Heller*, the Seventh Circuit sat *en banc* to consider whether § 922(g)(9) violates the Second Amendment. The majority ultimately determined that the statute remains valid by, among other things, citing founding era sources supporting categorical limitations on firearm possession by persons convicted of crime. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). While *Bruen* might have prompted much litigation around the country, its holding did invalidate *Skoien*, which remains valid, binding precedent on this Court and this Court should therefore deny the motion. *See United States v. Farley*, 2023 U.S. Dist. LEXIS 21146, at *6 (C.D. Ill. Feb. 8, 2023); *United States v. Patterson*, No. 22-cr-52 (E.D. Wis. April 4, 2023) (Dkt. 29 at 6) (Attached as Exhibit B).

**C.     The Constitutional right to bear arms for self-defense only covers law-abiding citizens; Domestic abusers are not law-abiding citizens.**

Even if this Court engages in its own analysis, the result is the same under the first step of the *Bruen* test since Defendant is not one of the "people" who fall within the plain language of the Second Amendment.

As this Court has noted, the Second Amendment protections only apply to "law-abiding," responsible citizens. *United States v. Drake*, No. 1:23cr21 (N.D. Ind. Nov. 16, 2023) (Dkt. 39). The petitioners in *Bruen* were "two ordinary, law-abiding, adult citizens," which specifically made them a "part of 'the people' whom the Second Amendment protects." 142 S. Ct. at 2134. Justice Kavanaugh, noted in his concurring opinion that, "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally

5

ill, or laws forbidding the carrying of firearms in sensitive places." *Id.* at 2262. Justice Alito's concurrence clarifies the Court's majority decision that the Second Amendment protects the rights of "law-abiding" citizen to keep and carrying firearms for their protection and that they were not disturbing anything they said in *Heller* or *McDonald v. Chicago,* 561 U.S. 742 (2010), about the kinds of weapons that people my possess or about restrictions that may be imposed on the possession or carrying of guns. *Id.* at 2157.

Based on this Court's prior decision regarding the scope of the Second Amendment, the analysis here is simple: if the "extension of disqualification to non-violent felons (embezzlers and tax evaders, for example) is presumptively constitutional … it is difficult to condemn § 922(g)(9), which … is limited to violent crimes." *Skoien,* 614 F.3d at 641. A person convicted of a misdemeanor crime of domestic violence is, by definition, not law-abiding; he is certainly not responsible, since he has committed a violent crime. He is therefore not part of the "people" and does not fall within the plain language of the Second Amendment. Accordingly, "every court that has been asked to invalidate § 922(g)(9) on constitutional grounds has declined to do so." *Farley,* 2023 U.S. Dist. LEXIS 21146, *5 (collecting cases). Post-*Farley,* courts continue to find § 922(g)(9) constitutional. *See United States v Hamond,* 656 F.Supp.3d 857 (S.D. Iowa Feb. 15, 2023); *United States v. Ryno,* 2023 WL 3736420 (D. Alaska, May, 31, 2023); *United States v. Hughes,* 2023 WL 4205226 (D.S.C, June 27, 2023); *United States v. Donahue,* 2023 WL 4372706 (S.D. Texas, July 5, 2023); *United States v. Springer,* 2023 WL 4981583 (N.D. Iowa, Aug. 3, 2023);

6

*United States v. Brooks,* 2023 WL 7706554 (N.D. Iowa, Nov. 15, 2023); *United States v. Quintin Travey Jones,* 2023 WL 8275969 (N.D. Ga., Nov. 30, 2023).[1]  A person convicted of a misdemeanor crime of violence is exactly the kind of non law-abiding, dangerous person that the Second Amendment does not protect and this Court should therefore deny the motion.

**D.   Longstanding history of disarming violent criminals demonstrates that § 922(g)(9) withstands the historical analysis outlined in *Bruen*.**

Finally, the historical analysis at *Bruen*'s second step provides an independent but sufficient reason to deny the motion. Defendant argues that § 922(g)(9) must fail under *Bruen* because "there was no 'historical tradition,' as of 1791, of barring domestic violence persons from possession firearms, and more recent legislative enactments cannot supplant the understanding of the right to keep and bear arms that prevailed when the Second Amendment was enacted." [Dkt. 36, at 10.]  While it is true that laws prohibiting convicted domestic abusers from possessing firearms did not exist at the time of the Founding, Defendant's argument misunderstands the

---

[1] The government recognizes the 4th Circuit decision in *United States v. Rahimi,* 61 F.4th 443, (4th Cir.2023), *cert granted* June 30, 2023 and argued on November 7, 2023, which held that the federal statutes prohibiting possession of firearms by someone subject to a domestic violence restraining order violates the Second Amendment. *Rahimi* was wrongly decided, as the Government argued to the Supreme Court.  However, this Court need not address its reasoning since *Rahimi* deals with the constitutionality of a completely different offense, 18 U.S.C. § 922(g)(8).  Section 922(g)(8) is not an appropriate analogue because (1) it "disarms individuals after a civil proceeding, whereas Section 922(g)(9) does so after a criminal proceeding"; (2) it "disarms people based on a finding of a credible threat, whereas Section 922(g)(9) disarms by class or group—*i.e.*, those convicted of a misdemeanor crime of domestic violence"; and (3) it "disarms an individual for the protection of an identified person from the threat of domestic gun abuse, whereas Section 922(g)(9) disarms a class or group of people to maintain political and social order." *Donahue*, 2023 WL 4372706, at *4 (quotations and citations omitted).

7

*Bruen* analysis, which instructs the courts to consider both the "comparable burden" and "comparable justification" of firearm regulation when looking to see if a modern law is "relevantly similar" under the Second Amendment. *Bruen* at 2123-33. To be sure, *Bruen* said that, where a modern regulation addresses "a general societal problem that has persisted since the 18th century," "the lack of a distinctly similar historical regulation"—or a historical regulation that address the problem "through materially different means"—could be "relevant evidence" that the statute is unconstitutional. *Bruen*, 142 S. Ct. at 2131. But *Bruen* did not suggest that a statute is unconstitutional simply because it involves a new way to address longstanding concerns. As *Bruen* recognized, some modern statutes implicate "unprecedented societal concerns," and some modern regulations "were unimaginable at the time of the founding." *Id.* at 2132.[2] Yet those statutes are constitutional if supported by an appropriate "historical analogue." *Id.* at 2133.

While there might not have been laws prohibiting domestic abusers from possessing firearms, *Bruen* does not require an identical historical regulation.

---

[2] While domestic violence has long been recognized as a problem, the problem may have changed in the last two centuries. Although crime statistics from the founding era are hard to come by, there is reason to doubt that domestic *homicide* was as prevalent at the founding as it is in the modern era. Between 1980 and 2008, more than 16% of homicides in the United States—and more than 41% of homicides where the victim was female—were committed by the victim's spouse or intimate partner, with more than half of those homicides involving a firearm. Bureau of Justice Statistics, Homicide Trends in the United States, 1980-2008, 10, 16-17 (Tables 6, 8) (November 2011), available at, https://bjs.ojp.gov/content/pub/pdf/htus8008.pdf. Thus, the problem that § 922(g)(9) seeks to address – the danger posed by those who have already been convicted of at least one act of domestic violence - may not have existed to the same degree in 1791, meaning that little can be drawn from legislatures' failure to enact precisely analogous laws at the time.

8

Rather, § 922(g)(9) passes *Bruen*'s second step because (1) there is a historical precedent for disarming violent, convicted individuals, and (2) the statute is also sufficiently analogous to those disarming other individuals that were deemed "dangerous" (regardless of any prior conviction).

First, the class of persons with which § 922(g)(9) is concerned—convicted violent individuals—have historically been restricted from firearm ownership and possession. The precursor to the Second Amendment proposed at the Pennsylvania ratifying convention stated: "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals." *Skoien*, 614 F.3d at 640. That proposal reflects a contemporary belief during the founding era that the government could disarm a person for any crime, not just a felony. Moreover, there is a robust historical tradition of disarming people convicted of a "crime of violence." *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harvard Journal of Law & Public Policy 695, 701 (2009). This tradition suggests that, at a minimum, a misdemeanor crime of domestic violence is a permissible basis for disarmament.

Accordingly, following *Heller*, many courts of appeals, accepted the argument that domestic-violence misdemeanants are sufficiently akin to felons that they too can be disarmed. *See Skoien*, 614 F.3d at 643-44; *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013); *United States v. Staten*, 666 F.3d 154, 158 (4th Cir. 2011); *United States v. Booker*, 644 F.3d 12, 23-25 (1st Cir. 2011); *United States v. Chester*, 628 F.3d 673, 680-81 (4th Cir. 2010). *See also United States v. Walker*, 709 F. Supp. 2d 460,

465-66 (E.D. Va. 2010); *Kanter v. Barr*, 919 F.3d 437, 454, 456-58 (7th Cir. 2019) (Barrett, J., dissenting) ("The historical evidence does, however, support a different proposition: that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety. This is a category simultaneously broader and narrower than 'felons'—it includes dangerous people who have not been convicted of felonies but not felons lacking indicia of dangerousness.").

Second, an analogy can be drawn between Section 922(g)(9) and founding-era legislation that disarmed people who were deemed dangerous (regardless of their prior conviction status). Section 922(g)(9) targets a specific group—those who have been convicted of a crime of domestic violence—who fall within the broader class of dangerous persons who have *always* been within the government's power to regulate. *See Bruen*, 142 S. Ct. at 2150 ("Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize others."). A historical practice has existed generally disarming people deemed to be dangerous, such as those unwilling to swear an oath of allegiance to the colonies or the states. Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment,* 25 Law & Hist. Rev. 139, 157-60 (2007); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control,* 73 Fordham L. Rev. 487, 506-08 (2004). Indeed, the prohibition of possession of firearms by domestic violence misdemeanants, and other groups identified as dangerous, is supported by history. *See, e.g.*, Lawrence

10

Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187, 1239 (2015) ("[H]istory suggests that when the legislature restricts the possession of firearms by discrete classes of individuals reasonably regarded as posing an elevated risk for firearms violence, prophylactic regulations of this character should be sustained."); Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009) (citing historical examples for the proposition that "any person viewed as potentially dangerous could be disarmed by the government without running afoul of the 'right to bear arms.'").

The historical record reflects significant regulation of firearms designed to ensure public safety and responsible gun ownership. In the founding era, firearms "could be required to be registered," gun owners could be required to undergo training, and the law could mandate storage requirements for "firearms and gun powder." *United States v. Nutter*, 624 F.Supp.3d 636, 641 (S.D. W. Va. 2022) (citing Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1562-63 (2009)). Finally, founding era laws prohibited bearing arms in a way that spread "fear" or "terror" among the people. *Bruen* at 2145. "In sum, founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Nutter*, 624 F. Supp. 3d at 643 (citing *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019), abrogated by *Bruen*, 142 S.Ct. 2111 (Barrett, J., dissenting)).

And, historical records show that domestic abusers were considered dangerous. There have long been protections—most notably the common-law surety

11

process—to aid victims of domestic violence. Blackstone observed that a husband "was prohibited to use any violence to his wife." 1 Blackstone 432. Thus, Blackstone said, "a wife may now have security of the peace against her husband; or, in return, a husband against his wife." *Id.* at 433. In one case that Blackstone cited, the wife "made oath in Court, that she was in danger of her life by [her husband]," and the court "offered to bind him with sureties," despite multiple affidavits attesting to the husband's "good usage" of his wife. *King v. Lord Lee*, 83 Eng. Rep. 482 (K.B. ca. 1675). In another, the husband swore out the peace against his wife. *Sims's Case*, 93 Eng. Rep. 1131 (1743-44). The English common-law system has thus allowed spouses to seek protection from abuse for centuries. *See also Lord Leigh's Case*, 84 Eng. Rep. 807 (1674) (the wife "upon affidavit of hard usage, and that she went in fear of her life, prayed security of the peace against [her husband], which was granted"); *Manby v. Scott*, 82 Eng. Rep. 1000, 1005 (Ex. 1659) (observing that a husband "cannot kill" his wife, "nor can he beat her, for the wife can seek the peace"), *as translated by* Henry Ansgar Kelly, "Rule of the Thumb and the Folklaw of the Husband's Stick," 44 J. Legal Ed. 341, 354 (1994); *Sir Thomas Seymor's Case*, 72 Eng. Rep. 966 (K.B. ca. 1615) ("[A] wife can have the peace against her husband for unreasonable correction."), *as translated by* Kelly, 44 J. Legal Ed. at 355.

In America, "the Massachusetts Bay and Plymouth colonies had laws against spouse beating." Carolyn B. Ramsey, "The Stereotyped Offender: Domestic Violence and the Failure of Intervention," 120 Penn. State L. Rev. 337, 344 (2015). For example, the Massachusetts Body of Liberties provided that "[e]very married woman

shall be free from bodily correction or stripes by her husband, unless it be in his own defense upon her assault." Massachusetts Body of Liberties § 80 (1641), available at, https://www.mass.gov/doc/1641-massachusetts-body-of-liberities/download.

Although other colonies did not protect spouses by statute, America's first family law treatise observed that a husband or wife's "violation of each other's rights, by an unjustifiable violence, is a breach of the laws of society, for which they are liable *criminaliter*." Tapping Reeve, The Law of Baron and Femme; of Parent and Child; of Guardian and Ward; of Master and Servant; and of the Powers of Courts of Chancery 65 (New Haven, Oliver Steele 1816). And, the treatise explained, a husband or wife "may institute a process against each other, the object of which is to compel them to find securities for their good behavior." *Id.* at 65-66; *see also State v. Davis*, 3 Brev. 5 S.C.L. 3, 4 (S.C. Const. Ct. App. 1811) ("It is clear that a wife may demand sureties of the peace against her husband, and so may her husband against her."). Thus, while § 922(g)(9) may be a recent means of protecting victims of domestic violence, there are historical analogues that allowed spouses to be protected from domestic violence and which show that domestic abusers were and are considered violent.

Section 922(g)(9)'s prohibition on those who have been convicted criminally for domestic violence sits at the intersection of the longstanding history of the prevention of domestic violence and the equally longstanding history of disarming those who pose a danger to others. Hatch's claim that 922(g)(9) infringes on his Second Amendment right should be denied.

13

### III. CONCLUSION

For the reasons stated above, the Court should DENY defendant's motion to dismiss Count 7.

Respectfully submitted,

CLIFFORD D. JOHNSON
UNITED STATES ATTORNEY

By:  Stacey R. Speith
Assistant United States Attorney
E. Ross Adair Federal Bldg.
& U.S. Courthouse
1300 S. Harrison Street, Room 3128
Fort Wayne, IN 46802-3489
Telephone: (260) 422-2595
Facsimile: (260) 426-1616
E-mail: stacey.speith@usdoj.gov